[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 540.]

LAKESIDE AVENUE LIMITED PARTNERSHIP, APPELLANT, v. CUYAHOGA COUNTY BOARD OF REVISION ET AL., APPELLEES.

[Cite as *Lakeside Avenue Ltd. Partnership v. Cuyahoga Cty. Bd. of Revision*, 1996-Ohio-175.]

*Taxation—Real property valuation—Board of Tax Appeals' valuation of property unlawful and unreasonable, when—Standard to apply in determining whether a sale of property was an arm's-length transaction and the best evidence of true value.*

(No. 94 -1998—Submitted March 5, 1996—Decided June 5, 1996.)

APPEAL from the Board of Tax Appeals, No. 92-A-920.

————————————

{¶ 1} This is an appeal from a decision of the Board of Tax Appeals ("BTA") involving the determination, for tax purposes, of the true value of a parcel of property located near downtown Cleveland, Ohio. The facts and events giving rise to this appeal are as follows.

{¶ 2} Triton Transport Services, Inc. ("Triton") is engaged in the business of freight transportation and materials handling. The property is located across the street from Triton's main shipping facility on Lakeside Avenue. The property is a ten-acre, irregularly shaped gravel parking lot. In 1987, Triton leased a portion of the property from American Prime Properties, Inc. ("Prime Properties") for use as a parking and storage lot. The term of the lease was five years with an option to renew for an additional five years. The lease granted the landlord, Prime Properties, the right to terminate the lease upon six months' written notice if the landlord intended to either sell or develop the property. In 1989, Prime Properties and Triton executed an addendum to the lease whereby Triton agreed to lease the remainder of the property under the terms of the 1987 lease.

**{¶ 3}** Also, in 1989, Triton entered into an agreement with Santa Fe Railroad ("Santa Fe") to manage an "IMX ramp" for Santa Fe on the subject property. Specifically, Triton was awarded a contract to serve as a drayman for Santa Fe and was responsible for bringing truck trailers over the roads from Santa Fe's Chicago railhead to the Cleveland ramp and managing the Cleveland ramp as a virtual rail terminal. Triton obtained equipment and hired personnel to conduct its drayage business for Santa Fe. Triton's contract with Santa Fe became a major portion of Triton's business, accounting for approximately fifty percent of Triton's total business activity from 1989 through 1991.[1]

**{¶ 4}** In late 1990 or in January 1991, after Triton had secured the contract with Santa Fe, Prime Properties informed Triton of its intention to develop the property and to terminate Triton's lease of the ten-acre site. At that time, James Kassouf, a representative of Prime Properties, offered to sell Triton the property for $1.2 million. Kassouf made clear that the stated price was not subject to negotiation. Triton considered the offering price to be exorbitant, since Prime Properties had acquired the property in 1987 for $500,000. However, according to Steven Kimmelman, a director and shareholder of Triton:

"We [Triton] didn't have a choice. We had to buy it. If we didn't buy it, we probably would have filed Chapter 11 and then 7 [bankruptcy]. The consequences, you know, when you're dealing with Santa Fe or anyone in the rail business, the last thing that you want to do is tell them -- We bid a package -- that you're going to possibly relocate which we -- there wasn't any land or location to relocate to. Santa Fe would have canceled the bid, and we no longer would have been a ramp.

---

1. Triton's contract with Santa Fe also accounted for a major portion of Triton's business in the years following 1991.

"Our sales would have decreased quickly and dramatically, yet our expenses would have stayed relatively the same. We didn't have the financial wherewithal or the cash available to withstand that kind of a hit. We would have been out of business."

{¶ 5} Thus, Triton set out to secure financing to purchase the property for $1.2 million. Initially, Triton approached NBD Bank, Triton's primary asset-based lender. However, this bank refused to finance the purchase and prohibited Triton from applying Triton's cash or working capital to acquire the property. Next, Triton attempted to secure financing through Ohio Savings Bank. However, Ohio Savings Bank refused to finance the purchase through conventional financing, stating that the asking price for the property was simply "outrageous."

{¶ 6} Ultimately, Triton's principals formed Lakeside Avenue Limited Partnership ("Lakeside"), appellant, to secure financing to purchase the property. In order to obtain a $650,000 loan from Ohio Savings Bank, Lakeside, Triton and Frank Price, Triton's principal shareholder, executed a promissory note in favor of Ohio Savings Bank for $650,000. The note was secured by a mortgage on the property, the real and personal property owned by Triton and certain personal assets owned by Price. To obtain a total of $350,000 in loans from the seller, Lakeside, Triton and Price executed promissory notes in favor of Prime Properties Limited Partnership for $188,000 and $162,000. These notes were secured by a second mortgage on the property and the assets of Lakeside and Triton. Additionally, the city of Cleveland was concerned that Triton would go out of business if Lakeside did not acquire the property. Thus, the city made a $100,000 loan to Lakeside to avoid significant job losses in the Cleveland area. Lakeside also obtained a $63,000 grant from the state of Ohio to help fund the purchase of the property. Further, Triton was required to place over $209,000 of its working capital into an escrow account. As a result of these various financing arrangements, Lakeside was able to

purchase the property for $1.2 million. Lakeside closed on the transaction on July 16, 1991.

{¶ 7} For tax year 1991, the Cuyahoga County Auditor had valued the property at $550,000. However, upon learning of the July 1991 sale, the Cleveland Board of Education, appellee, filed a complaint with the Cuyahoga County Board of Revision, seeking to increase, for tax purposes, the valuation of the property. Specifically, the board of education sought to increase the valuation from $550,000 to $1.2 million to reflect the price for which the property had been sold in July 1991. Lakeside responded by filing a complaint with the board of revision to retain the auditor's $550,000 property valuation, claiming that the $1.2 million sale price "was not arm's length and does not reflect true fair market value of property." The board of revision determined that the true value of the property for tax year 1991 was $1.2 million based on the location of the property and the $1.2 million Lakeside had paid to acquire the property in July 1991.

{¶ 8} Thereafter, Lakeside appealed to the BTA, claiming that the board of revision had overvalued the property. Specifically, Lakeside urged that the July 1991 sale of the property was not an arm's-length transaction, since Lakeside had been forced to purchase the property at an excessive price based upon necessitous business circumstances. At the BTA hearing, Lakeside presented unrebutted evidence and testimony concerning the circumstances of the July 1991 sale. Additionally, Lakeside presented the expert testimony and appraisal report of Robert J. Kocinski. According to Kocinski, the fair market value of the property as of January 1, 1991 (the tax lien date) was $620,000. Neither the board of revision nor appellee Cleveland Board of Education presented any appraisal evidence at the hearing.

{¶ 9} Following the hearing, the BTA, relying on the test for economic duress set forth in *Blodgett v. Blodgett* (1990), 49 Ohio St.3d 243, 551 N.E.2d 1249, found that the July 1991 sale of the property was the product of an arm's-length

transaction, *i.e.*, that the sale had not been the product of compulsion or duress. Thus, the BTA found that the price Lakeside had paid for the property was the true market value of the property for taxation purposes. With respect to Lakeside's appraisal evidence, the BTA stated, "Upon review of appellant's appraiser's report, this Board does not find that the valuation, as derived therein, [is] an accurate reflection of the subject [property], based upon the subject's superior location for industrial businesses * * *." Accordingly, the BTA determined that the true value of the subject property as of January 1, 1991 (the tax lien date) was $1.2 million.

{¶ 10} The cause is now before this court upon an appeal as of right.

_____

*Benesch, Friedlander, Coplan & Aronoff* and *Orla E. Collier III*, for appellant.

*Armstrong, Mitchell & Damiani*, *Timothy J. Armstrong* and *Deborah J. Papushak*, for appellee Cleveland Board of Education.

_____

**DOUGLAS, J.**

{¶ 11} The issue for our consideration is whether the BTA's valuation of the property was unlawful or unreasonable. For the reasons that follow, we find that the BTA's decision was both unlawful and unreasonable, and, accordingly, we reverse the decision of the BTA.

{¶ 12} R.C. 5713.03 provides, in part:

"In determining the true value of any tract, lot, or parcel of real estate under this section, if such tract, lot, or parcel has been the subject of an arm's length sale between a willing seller and a willing buyer within a reasonable length of time, either before or after the tax lien date, the auditor shall consider the sale price of such tract, lot, or parcel to be the true value for taxation purposes."

{¶ 13} This court has held, on a number of prior occasions, that "[t]he best evidence of the 'true value in money' of real property is an actual, recent sale of

the property in an arm's-length transaction." *Conalco v. Monroe Cty. Bd. of Revision* (1977), 50 Ohio St.2d 129, 4 O.O.3d 309, 363 N.E.2d 722, paragraph one of the syllabus. See, also, *Consol. Aluminum Corp. v. Monroe Cty. Bd. of Revision* (1981), 66 Ohio St.2d 410, 414, 20 O.O.3d 357, 359, 423 N.E.2d 75, 78; and *Meyer v. Cuyahoga Cty. Bd. of Revision* (1979), 58 Ohio St.2d 328, 333, 12 O.O.3d 305, 307, 390 N.E.2d 796, 799. However, in *Ratner v. Stark Cty. Bd. of Revision* (1986), 23 Ohio St.3d 59, 23 OBR 192, 491 N.E.2d 680, syllabus, a majority of this court held that "[a]lthough the sale price is the 'best evidence' of true value of real property for tax purposes, *it is not the only evidence*. A review of independent appraisals based upon factors other than the sale price is appropriate where it is shown that the sale price does not reflect true value." (Emphasis added.) The *Ratner* majority also stated, "This court has never adopted an absolutist interpretation of this statute [R.C. 5713.03]. Our decisions and those of other jurisdictions with similar statutes have approved of considering factors that affect the use of the sale price of property as evidence of its true value. Such factors might include: mode of payment, sale-lease arrangements, abnormal economic conditions and the like." *Id*. at 61, 23 OBR at 194, 491 N.E.2d at 682. Nevertheless, the *Ratner* majority recognized that there exists a rebuttable *presumption* that the sale price reflects true value. *Id*. at 61, 23 OBR at 193, 491 N.E.2d at 682. See, also, *Walters v. Knox Cty. Bd. of Revision* (1989), 47 Ohio St.3d 23, 24, 546 N.E.2d 932, 934.

{¶ 14} In *Walters*, *id*. at the syllabus, this court defined what is meant by the phrase "arm's-length sale": "An arm's-length sale is characterized by these elements: it is voluntary, *i.e.*, *without compulsion or duress*; it generally takes place in an open market; and the parties act in their own self-interest." (Emphasis added.)

{¶ 15} In the case at bar, the BTA recognized, in light of *Ratner* and *Walters*, *supra*, that the question before it was "whether the sale of the subject property can be considered an arm's-length sale, considering the totality of the

circumstances surrounding the transaction. If it can, such sale would be used as the most probative evidence of the value of the property. If it cannot be so established, then the Board must look to other evidence of value set forth in the record before it." However, in considering whether the sale was an arm's-length transaction, and in rejecting Lakeside's contention that economic necessity had forced Lakeside to purchase the property at an excessive price, the BTA applied the test for economic coercion set forth in *Blodgett*, *supra*, 49 Ohio St.3d 243, 551 N.E.2d 1249. We find that the BTA erred in this regard.

{¶ 16} In *Blodgett*, *supra*, syllabus, we held that "*[t]o avoid a contract* on the basis of duress, a party must prove coercion by the other party to the contract. It is not enough to show that one assented merely because of difficult circumstances that are not the fault of the other party." (Emphasis added.) In *Blodgett*, we also stated:

"The law of duress as a reason to avoid a contract has evolved to encompass 'economic duress' as well as physical compulsion. 1 Restatement of the Law 2d, Contracts (1981), Section 176, Comment *a*. * * * A person who claims to have been a victim of economic duress must show that he or she was subjected to '* * * a wrongful or unlawful act or threat, * * *' and that it '* * * deprive[d] the victim of his unfettered will.' 13 Williston on Contracts (3 Ed. 1970) 704, Section 1617. Further, '* * * [m]erely taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion.' *Id*. at 708. The Restatement of the Law 2d, Contracts, *supra*, also requires that the one who coerces the victim be the other party to the agreement: 'If a party's manifestation of assent is induced by an improper threat *by the other party* that leaves the victim no reasonable alternative, the contract is voidable by the victim.' (Emphasis added.) *Id*. at 475, Section 175(1).

"The United States Court of Claims summarized what a party must prove to establish duress: '["]An examination of the cases * * * makes it clear that three elements are common to all situations where duress has been found to exist. These are: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) *that said circumstances were the result of coercive acts of the opposite party. * * * The assertion of duress must be proven to have been the result of the defendant's conduct and not by the plaintiff's necessities. * * *["]'* (Emphasis added.) *Urban Plumbing & Heating Co. v. United States* (U.S. Ct. of Claims 1969), 408 F. 2d 382, 389-390, quoting *Fruhauf Southwest Garment Co. v. United States* (U.S. Ct. of Claims 1953), 111 F. Supp. 945, 951." *Blodgett*, *supra*, 49 Ohio St.3d at 245-246, 551 N.E.2d at 1251.

{¶ 17} *Blodgett* sets forth the applicable standards for *avoiding a contract* on the basis of economic duress. However, Lakeside does not seek to avoid any contract in this case. Rather, Lakeside claims that economic necessity forced it to purchase the property for an excessive price and that, therefore, the sale price should not have been considered by the BTA as the determinative factor in calculating true value. Accordingly, the issue here is whether the sale of the subject property was an arm's-length transaction and reflective of true value -- not whether the sale contract may be avoided. Thus, the strict standards outlined in *Blodgett* for avoiding a contract on the basis of duress are clearly inapplicable here.

{¶ 18} The BTA's decision in this case highlights what appears to be an ongoing battle between the BTA and the Court of Appeals for Franklin County over the correct standard to be applied in considering whether a sale transaction constitutes an "arm's-length sale" within the meaning of *Walters*, *supra*, 47 Ohio St.3d 23, 546 N.E.2d 932, syllabus. Specifically, the BTA and the Court of Appeals for Franklin County differ over what standard to apply for economic duress in determining whether a sale was an arm's-length transaction and the best evidence of true value. As the following discussion illustrates, the Court of Appeals for

8

Franklin County has repeatedly attempted, with little or no success, to ensure that the BTA apply a less stringent standard for economic duress in cases involving true value determinations.

{¶ 19} In *Columbus Bd. of Edn. v. Franklin Cty. Bd. of Revision* (Jan. 28, 1992), Franklin App. Nos. 90AP-317 and 90AP-324, unreported, 1992 WL 15246, Grange Mutual Insurance Company ("Grange") owned all but one parcel of property in a city block. Grange attempted for several years to acquire the single remaining parcel from Katherine Hostettler, the landowner, who repeatedly refused to sell. Following Hostettler's death, her estate did not offer the property for sale to the general public but offered to sell the property to Grange for an allegedly excessive price. Grange purchased the property from the estate in November 1986 for $325,000 to build an office tower on the site. Both the Franklin County Auditor and the Franklin County Board of Revision determined that the true value of the subject property *for tax year 1987* was $107,600 -- significantly less than the sale price. On appeal, the BTA determined that the sale price of the property constituted its true value for tax year 1987. On further appeal, the Court of Appeals for Franklin County reversed the BTA's decision and remanded the cause for further proceedings, finding:

"The BTA apparently misconstrued this definition [of arm's-length sale set forth in the syllabus in *Walters*, *supra*, 47 Ohio St.3d 23, 546 N.E.2d 932]. Rather than applying the definition objectively, the BTA applied it only subjectively. An objective approach necessarily is required since fair market value is the extrinsic, not intrinsic, value of the property.

"An objective approach requires the BTA to consider whether, in general, an informed willing buyer would have paid an informed willing seller $325,000 in the open market for this property without the special circumstances that Grange contends prompted it to pay the alleged premium price. Instead, the BTA considered only whether the individuals involved (Grange and the estate), under

9

these circumstances willingly exchanged the property for a purchase price of $325,000. Obviously, they did since the seller (the estate) would be quite willing to accept a price greatly in excess of the actual fair market value where a buyer (Grange) is so anxious to acquire the property (for whatever reason) that it is willing to pay a substantial premium for the property -- that is, an amount substantially in excess of its fair market value. The subjective motives of the buyer and seller may, therefore, be utilized to demonstrate the sale was the result of compulsion or duress." *Columbus Bd. of Edn, supra,* at 6-7, 1992 WL 15246 at 3.

{¶ 20} On remand from the court of appeals' decision in *Columbus Bd. of Edn.*, *supra*, the BTA did not reassess the arm's-length nature of the transaction under the criteria established by the appellate court. See *Columbus Bd. of Edn. v. Franklin Cty. Bd. of Revision* (Nov. 13, 1992), BTA No. 88-K-1105, unreported, 1992 WL 345356. Instead, the BTA chose to consider whether the doctrine of collateral estoppel applied to bar relitigation of the arm's-length nature of the sale, since the BTA had determined in a previous case (*Grange Mut. Ins. Co. v. Franklin Cty. Bd. of Revision* [June 30, 1988], BTA No. 87-C-1217, unreported, 1988 WL 162339) that the sale between Grange and Hostettler's estate had been an arm's-length transaction and the best indicator of true value for tax year *1986*. *Columbus Bd. of Edn., supra,* BTA *No. 88-K-1105*, unreported, 1992 WL 345356. On this basis, the BTA found that the arm's-length nature of the sale transaction between Grange and Hostettler's estate could not be relitigated, and that the sale price was the best evidence of true value for tax year *1987*. *Id.*, 1992 WL 345356, at 4-11. Thereafter, the matter was appealed to the court of appeals for a second time, but the court of appeals agreed with the BTA on the issue of collateral estoppel. See *Columbus Bd. of Edn. v. Franklin Cty. Bd. of Revision* (Dec. 28, 1993), Franklin App. *No. 92AP-1715*, unreported, 1993 WL 540285.

{¶ 21} Meanwhile, in *Columbus Bd. of Edn. v. Franklin Cty. Bd. of Revision* (Sept. 29, 1992), Franklin App. No. 92AP-281, unreported, 1992 WL 249883—an

unrelated tax valuation case—the Court of Appeals for Franklin County summarily reversed a BTA decision, where the BTA had failed to analyze a case in accordance with the appellate court's decision in *Columbus Bd. of Edn., supra,* Franklin App. Nos. 90AP-317 and 90AP-324, unreported, 1992 WL 15246. The court of appeals (in Franklin App. No. 92AP-281) specifically rejected a holding by the BTA that a recent sale was the best evidence of true value, where special economic reasons or motives had fueled the buyer's decision to purchase the property. *Columbus Bd. of Edn., supra,* Franklin App. No. 92AP-281, unreported, at 3-4, 1992 WL 249883, at 2. On remand, the BTA complied (albeit reluctantly) with the court of appeals' instructions to assign a different value to the property -- a value that was less than the sale price. See *Columbus Bd. of Edn. v. Franklin Cty. Bd. of Revision* (Aug. 20, 1993), BTA No. 90-D-359, unreported, 1993 WL 334307.

{¶ 22} In the case at bar, the BTA brought to a head the conflict between its decisions and those of the Court of Appeals for Franklin County on the issue regarding the proper standard to apply in determining whether a sale of property was an arm's-length transaction and the best evidence of true value. Specifically, in its decision, the BTA rejected the views of the Tenth District Court of Appeals on the issue of economic duress by expressly relying on *Blodgett*, *supra*, 49 Ohio St.3d 243, 551 N.E.2d 1249, and by stating, in part:

"In considering whether a sale constituted an arm's-length transaction, both the appellant [Lakeside] and the appellee school board discussed the applicability of [*Columbus Bd. of Edn., supra*, Franklin App. *Nos. 90AP-317 and 90AP-324*, unreported, 1992 WL 15246] to the facts herein. In said case, the Tenth District Court of Appeals held that a 'sale is not the result of an arm's-length transaction when a seller is economically required to sell his or her property. * * * Just as such a sale would not be the result of an arm's-length transaction, neither is a sale when the buyer is under similar economic compulsion.' Later, in [*Columbus Bd. of Edn.,*

*supra*, Franklin App. *No. 92AP-281*, unreported, 1992 WL 249883] the Tenth District Court of Appeals reiterated its position * * *.

"This Board did not necessarily agree with the Tenth District Court of Appeals' views on economic duress as expressed in [*Columbus Bd. of Edn., supra*, Franklin App. Nos. 90AP-317 and 90AP-324, unreported, 1992 WL 15246, and *Columbus Bd. of Edn., supra*, Franklin App. No. 92AP-281, unreported, 1992 WL 249883] as applied to the specific facts of those cases; *our views are clearly set forth in this Board's treatment of said cases on remand.* See [*Columbus Bd. of Edn., supra,* BTA *No. 88-K-1105*, unreported, 1992 WL 345356, and *Columbus Bd. of Edn., supra,* BTA *No. 90-D-359*, unreported, 1993 WL 334307]. In *Columbus Bd. of Edn. v. Franklin Cty. Bd. of Revision* (April 23, 1993), BTA No. 91-P-1122, unreported [1993 WL 141880], this Board held:

"'"Subjective motives" relied upon by an individual buyer or seller in entering into a given transaction may be examined to determine if the sale was the result of compulsion or duress. * * *

"'The fact that a buyer may be influenced by certain subjective factors or circumstances, alone, does not cause the sale price to be an unreliable measure of true value. * * *

"'Accordingly, a sale should not be disregarded merely because the parties are influenced by subjective factors or circumstances. These factors may affect the price a buyer ultimately elects to pay. But, all parties are subject to subjective factors or circumstances of one kind or another. * * *'

"*We find such earlier pronouncements to be dispositive of the facts herein.*

"Based upon the foregoing case law and a thorough review of the record, this Board has concluded that the subject sale was arm's-length in nature, a reflection of the real estate market and the motivations of buyers and sellers which drive the 'bargains' made and ultimately establish real property tax valuations." (Emphasis added.)

{¶ 23} Today, we resolve this ongoing conflict between the BTA and the Court of Appeals for Franklin County by specifically recognizing that compelling business circumstances of the type at issue in this case are clearly sufficient to establish that a recent sale of property was neither arm's-length in nature nor representative of true value. In this regard, we note that the BTA apparently accepted the credibility of Lakeside's witness, Steven Kimmelman, who testified concerning the compulsive circumstances surrounding Lakeside's decision to purchase the property. However, the BTA apparently concluded that those circumstances did not affect the arm's-length nature of the sale. We disagree with the BTA's determination in this regard.

{¶ 24} Here, Prime Properties offered to sell the subject property to Triton for a stated price. The price was non-negotiable. The property was not offered for sale on the open market. The record is clear that Triton felt compelled to purchase the property for the stated price. Failure to purchase the property would have resulted in the loss of a significant portion of Triton's business, which, in turn, would have resulted in Triton's bankruptcy. Triton attempted to secure financing for the transaction, but even Triton's primary asset-based lender would not finance the acquisition of the property, apparently due to the excessive asking price. Indeed, Triton's primary asset-based lender prohibited Triton from applying any cash or working capital toward the purchase of the property. Lakeside was formed by the principals of Triton to purchase the property for the price that had been demanded by the seller. Lakeside, Triton and others undertook some extraordinary, if not desperate, efforts to obtain sufficient financing for the transaction. Under these circumstances, we reject the BTA's conclusions that Lakeside's acquisition of the property was an arm's-length transaction and that the $1.2 million purchase price was representative of true value. Rather, in light of the undisputed evidence in this case, we find that Lakeside's purchase of the subject property was not "voluntary, *i.e.*, without compulsion or duress," within the meaning of *Walters,*

*supra*, 47 Ohio St.3d 23, 546 N.E.2d 932, syllabus, due to the economic pressures that came to bear on Lakeside's decision to acquire the property.

{¶ 25} The record clearly establishes that Lakeside never had any real choice but to purchase the property in question. The choice between Triton's survival on the one hand and swift and sure corporate death (bankruptcy) on the other hand presented Lakeside with no true alternative but to pay the price demanded by the seller. Accordingly, we hold that the July 1991 sale of the subject property was not an arm's-length sale due to the compulsive business circumstances fueling Lakeside's decision to acquire the property in question. Thus, the sale price was not indicative of the subject property's true market value. In so holding, we are keenly aware of the principle set forth in *Cuyahoga Cty. Bd. of Revision v. Fodor* (1968), 15 Ohio St.2d 52, 44 O.O.2d 30, 239 N.E.2d 25, syllabus: "The fair market value of property for tax purposes is a question of fact, the determination of which is primarily within the province of the taxing authorities, and this court will not disturb a decision of the Board of Tax Appeals with respect to such valuation unless it affirmatively appears from the record that such decision is unreasonable or unlawful." Here, the BTA's decision regarding the voluntary nature of the sale transaction was clearly in error and was based on the BTA's improper reliance on *Blodgett, supra*, 49 Ohio St.3d 243, 551 N.E.2d 1249. Thus, the BTA's determination of true value based on the sale price was unlawful and unreasonable.

{¶ 26} Contrary to the assertions of appellee Cleveland Board of Education, we find that the case at bar is distinguishable from this court's holding in *Cardinal Fed. S. & L. Assn. v. Cuyahoga Cty. Bd. of Revision* (1975), 44 Ohio St.2d 13, 73 O.O.2d 83, 336 N.E.2d 433. *In Cardinal Fed. S. & L. Assn.*, a taxpayer had acquired the remaining parcels of property in a site accumulation project for prices that were allegedly higher than the fair market value of the parcels. The BTA determined that the sale prices were reflective of true value. On appeal, this court affirmed the decision of the BTA despite the taxpayer's claims that "special or

necessitous circumstances" had caused the sale prices to exceed the fair market value of the parcels. However, in *Cardinal Fed. S. & L. Assn.*, the taxpayer had not been compelled to purchase the parcels in question and, indeed, conceded that the sales had been *voluntarily negotiated* between a willing buyer and a willing seller. Here, Lakeside did not voluntarily purchase property at a negotiated price -- Lakeside was *compelled* to purchase the subject property at a price that had been fixed by the seller for fear of losing Triton as a viable business enterprise.

{¶ 27} Having determined that the BTA erred in finding that the July 1991 sale of the subject property was an arm's-length transaction and the best evidence of true value, the next question that arises is what was the true value of the subject property? That issue is to be resolved by the BTA on remand.[2]

{¶ 28} For the foregoing reasons, we reverse the decision of the BTA and remand this cause for further proceedings. On remand, the BTA is instructed to make a determination of true value consistent with our opinion that the July 1991 sale of the subject property was not an arm's-length transaction and is not reflective of true value.

*Decision reversed*
*and cause remanded*.

MOYER, C.J., M.L. RESNICK, RESNICK and PFEIFER, JJ., concur.

F.E. SWEENEY and COOK, JJ., dissent.

MELVIN L. RESNICK, J., of the Sixth Appellate District, sitting for WRIGHT, J.

---

2. Lakeside has urged us to modify the BTA's decision by holding that the true value of the property is $620,000 based upon the expert appraisal evidence offered at the BTA hearing. However, the BTA specifically rejected Lakeside's appraisal evidence in this case, and, as we have held on a number of occasions, "[t]he BTA need not adopt any expert's valuation. It has wide discretion to determine the weight given to evidence and the credibility of witnesses before it." *R.R.Z. Assoc. v. Cuyahoga Cty. Bd. of Revision* (1988), 38 Ohio St.3d 198, 201, 527 N.E.2d 874, 877. See, also, *Witt Co. v. Hamilton Cty. Bd. of Revision* (1991), 61 Ohio St.3d 155, 157, 573 N.E.2d 661, 662-663. The BTA is entitled to revisit Lakeside's appraisal evidence on remand.

_____

**COOK, J., dissenting.**

{¶ 29} I respectfully dissent. The fact that Lakeside had a unique business need for this specific property and was willing to pay a premium for it does not support a conclusion that the sale was other than at arm's length.

{¶ 30} The standard of review requires this court to accord deference to the factual determinations of the taxing authority and to disturb a property valuation by the BTA only if it affirmatively appears from the record that the valuation is unreasonable or unlawful. *Cuyahoga Cty. Bd. of Revision v. Fodor* (1968), 15 Ohio St. 2d 52, 44 O.O.2d 30, 239 N.E.2d 25. In order to reverse the BTA, the majority must find that Lakeside rebutted the presumption that the sale price reflects true value. *Walters v. Knox Cty. Bd. of Revision* (1989), 47 Ohio St.3d 23, 24, 546 N.E.2d 932, 934.

{¶ 31} The BTA reasonably resolved the factual issues in favor of the presumption that the sale represents the true value. The majority opinion assumes that the BTA accepted the credibility of Lakeside's witness, Steven Kimmelman. Although no contrary testimony was presented, the BTA would not have been unreasonable in discounting Kimmelman's testimony that the company had no choice but to buy, that the Santa Fe *would have* canceled the bid, and that Triton would no longer have been a ramp and therefore would have gone into bankruptcy and then out of business. That testimony was speculative and suspect.

{¶ 32} Lakeside claims that it was blindsided and coerced into the purchase of this property when the lessor notified it of the lessor's intention to terminate the lease. The BTA was asked to believe that the continuing use of this parcel was the only thing between Lakeside and bankruptcy. Yet the only claim Lakeside ever had on continued access was a lease subject to termination *any time* with six months' notice.

**{¶ 33}** Taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must prove that it was caused by the one accused of coercion. 13 Williston on Contracts (3 Ed. 1970) 708, Section 1617. The difficulty that Lakeside faced was not caused by the lessor; it was always within the contemplation of the parties that the lease could be terminated. When the lessor stated that it would terminate the lease, Lakeside had to make a business decision whether to buy the property. This is not an unusual or peculiar situation in the sale of real estate. Given this, I fail to see the "wrongful or unlawful act or threat***[which] deprive[d] the victim of his unfettered will," as Williston defines "economic duress." 13 Williston on Contracts (3 Ed. 1970) 704, Section 1617. There is no evidence of an "improper threat" by the lessor as is necessary to a claim of coercion according to the Restatement of Contracts as cited by the majority opinion.

**{¶ 34}** Also tenuous as a basis for reversing the BTA is the fact that Triton's regular lender would not make the loan. A myriad of factors could have affected that decision, and besides, the purchasers *were able* to acquire the financing. As for the price paid for the property, Kimmelman testified that Prime Properties would not negotiate on the price. Lakeside, however, never attempted to negotiate or counter the asking price. Likewise, the majority seems to accord weight to the testimony that this property was not offered for sale on the open market. This was the precise objection that Justice Douglas raised to the definition of an arm's length sale in *Walters, supra,* saying: "[P]rivate sale transactions which are at arm's - length occur every day." *Walter*s, 47 Ohio St.3d at 26, 546 N.E.3d at 936.

**{¶ 35}** The real estate transaction that does *not* involve some circumstance of economic adversity as a factor in inducing the sale or purchase is the exceptional one, not vice versa as is held here. The test adopted by this majority opinion blurs what has been a fairly bright line rule and throws the definition of "arm's length" into a quagmire.

**{¶ 36}** For the foregoing reasons, I would affirm the decision of the BTA as being neither unreasonable nor unlawful.

F.E. SWEENEY, J., concurs in the foregoing dissenting opinion.

————————————