**BOARD OF ASSESSMENT APPEALS OF the STATE OF COLORADO and Logan County Board of Equalization, Petitioners,**

v.

**E.E. SONNENBERG & SONS, INC., Respondent.**

No. 88SC558.

Supreme Court of Colorado, En Banc.

Sept. 10, 1990.

28

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Larry A. Williams, Asst. Atty. Gen., Denver, for Petitioner Bd. of Assessment Appeals.

Roger L. Nixt, Logan County Atty., Sterling, for petitioner Logan County Bd. of Equalization.

Davis, Graham & Stubbs, Andrew M. Low, Denver, for respondent.

Justice LOHR delivered the Opinion of the Court.

This case concerns the valuation of the E.E. Sonnenberg & Sons, Inc. commercial cattle feedlot ("feedlot") for assessment of property taxes. The central question is whether in conducting a *de novo* review of the value placed on the feedlot for assessment purposes by the Logan County Board of Equalization for the 1985 tax year, the Board of Assessment Appeals ("Board") abused its discretion by relying solely on the cost approach to valuation rather than also giving consideration to the feedlot's value under the market approach. The Logan County District Court affirmed the Board's decision. The Colorado Court of Appeals reversed, based on the Board's failure to consider the market approach in valuing the feedlot, and remanded to the Board for rehearing. *E.E. Sonnenberg & Sons, Inc. v. Board of Assessment Appeals*, 768 P.2d 748 (Colo.App.1988). We granted certiorari to review the court of appeals' judgment. We agree with the court of appeals that the Board abused its discretion by failing to consider evidence of the feedlot's value under the market approach. We disagree, however, with the additional holding of the court of appeals that the Board erred in excluding evidence of the valuation placed on feedlots in other counties by assessors in those counties for the 1985 tax year. Accordingly, we affirm the judgment of the court of appeals in part and reverse it in part.

I.

E.E. Sonnenberg & Sons, Inc. ("taxpayer") constructed a commercial cattle feedlot in Logan County, Colorado, between 1974 and 1977. The facility occupies approximately 254 acres and has a maximum capacity of 28,000 head of cattle.[1]

For the tax year 1985, the Logan County Assessor determined that the feedlot had an actual value of $3,576,070 for tax assessment purposes.[2] Dissatisfied, the taxpayer petitioned the Logan County Board of Equalization[3] pursuant to section 39–8–

---

**1.** The feedlot includes 62 feed pens, holding and working pens, a shipping and receiving area, working sheds, a cattle shed, a 36,900 square foot pole shed, a 3,600 square foot horse barn, 4 hospitals, a 40–ton per hour feed mill, a 200,-000–bushel grain storage facility, a 1,632 square foot office with full basement, a 60–ton scale, a 6,000 square foot shop, a generator plant, 2 pump houses and 2 pit silos.

**2.** There is a discrepancy in the record concerning the actual value of the feedlot for tax year 1985 placed on the property by the Logan County Assessor. The Logan County Board of Equalization found the property originally to have been valued for assessment at $3,576,070. The findings of the Board indicate a higher figure—$3,668,600. The lower figure comports with the valuation stated by the Board and the taxpayer in their briefs, and we accept it as correct.

**3.** The record does not include evidence of the taxpayer's protest to the Logan County Assessor, *see* § 39–5–122(2), 16B C.R.S. (1989 Supp.), but the taxpayer's assertion in its brief that it first protested to the county assessor has not been challenged by the Board. The record also lacks a copy of the taxpayer's petition to the Logan County Board of Equalization.

106, 16B C.R.S. (1982 & 1989 Supp.),[4] and as a result obtained a 5% reduction in the valuation, to $3,397,280.

Still dissatisfied with the value assigned to the feedlot,[5] the taxpayer appealed to the Board pursuant to section 39–8–108(1), 16B C.R.S. (1989 Supp.).[6] The Board conducted a trial *de novo*,[7] at which the taxpayer's expert estimated the actual value of the feedlot using all three methods of valuation designated by section 39–1–103(5)(a), 16B C.R.S. (1989 Supp.), for property of the type at issue here. The statute provides in relevant part that

> [a]ll real and personal property shall be appraised and the actual value thereof for property tax purposes determined by the assessor of the county wherein such property is located. The actual value of such property ... shall be that value determined by appropriate consideration

of the cost approach, the market approach, and the income approach to appraisal. The assessor shall consider and document all elements of such approaches that are applicable prior to a determination of actual value.

The requirement that the cost, market and income approaches be used for valuing property such as feedlots for purposes of property taxation is also found in Article X, section 3(1)(a), of the Colorado Constitution.

Using the income approach,[8] the taxpayer's expert estimated the value of the feedlot at $1,344,000. He then valued the feedlot at $1,505,000 using the cost approach,[9] based on an estimated replacement cost of $4,300,000, less 65% physical, economic and functional depreciation as of 1977, the statutorily-determined base year for tax assessment purposes.[10] The tax-

---

**4.** The statutes governing taxation of property have been amended frequently. We cite the current statute except when the version in effect at times relevant to this case is different in some respect material to the issues before us.

**5.** The taxpayer did not object to the land value of $65,100 additionally assigned to the feedlot. In referring to the value of the feedlot in this opinion, we refer to the value of the improvements exclusive of the land. The expert testimony on comparable feedlot sales also includes only improvement value over and above the value of the land on which the feedlots are located.

**6.** In August 1985, when the taxpayer lodged its petition with the Board, § 39–8–108 provided that a taxpayer dissatisfied with the decision of a county board of equalization could appeal to the board of assessment appeals or to the district court. Ch. 302, sec. 2, § 39–8–108(1), 1985 Colo.Sess.Laws 1228, 1228–29. § 39–8–108 has since been amended to provide the taxpayer with three options: he may submit his case to binding arbitration; appeal first to the board of assessment appeals, and then to the court of appeals; or appeal directly from the county board of equalization to the district court, with the right to further appellate review. *See* § 39–8–108(1) to –(4), 16B C.R.S. (1989 Supp.).

**7.** At the time the taxpayer's appeal was under consideration by the Board, the *de novo* form of review by the Board was not mentioned in the statute. *See* Ch. 302, sec. 2, § 39–8–108(1), 1985 Colo.Sess.Laws 1228, 1228–29. § 39–8–108 has since been amended to require trial *de novo* of any appeal from the decision of a county board of equalization to the Board or directly to a

district court. *See* § 39–8–108(1), 16B C.R.S. (1989 Supp.). Administrative regulations promulgated by the Board clearly contemplate *de novo* evidentiary hearings in each case. *See* Board of Assessment Appeals v. Valley Country Club, 792 P.2d 299, 301 (Colo.1990).

**8.** The income approach is a common method for calculating the value of commercial properties, especially apartment buildings, office buildings and shopping centers. It generally involves calculating the income stream (rent) the property is capable of generating, capitalized to value at a rate typical within the relevant market. *See generally* Goldberg, 2 *New York University Proceedings of the Second Annual Institute on State and Local Taxation and Conference on Property Taxation*, § 17.01, at 17–2 (1984) (hereinafter *"Taxation Institute"*); 3 Colorado Assessor's Library, *Land Valuation Manual*, § I, at 1.52 (1989); Comment, *The Road to Uniformity in Real Estate Taxation: Valuation and Appeal*, 124 U.Pa.L.Rev. 1418, 1433–34 (1976) (hereinafter *"Real Estate Taxation"*).

**9.** The cost approach involves estimating the cost of replacing the improvements to the property, less accrued depreciation. It tends to establish the upper limit on value. *See generally* 2 *Taxation Institute, supra* note 8, § 16.03[1], at 16–41 to –42; *Real Estate Taxation, supra* note 8, at 1432–33.

**10.** The base year for tax year 1985 was set in § 39–1–104(10)(a), 16B C.R.S. (1982), which provided that, "[f]or the years 1983 through 1986, the 1977 level of value and the manuals and associated data published for the year 1977

payer's expert stated that in selecting the depreciation factor, he did not rely to any significant extent on the physical deterioration of the feedlot because in the 1977 base year the complex was relatively new. Instead, he based the 65% depreciation principally on the high economic obsolescence to which cattle feedlots were subject at the relevant time.[11]

The taxpayer's expert next estimated the value of the feedlot under the market approach[12] at $1,344,000. He based this estimate principally on sales of two comparable feedlots located outside Logan County, near Lamar, Colorado, and Scottsbluff, Nebraska, but within 200 miles of the feedlot and within the "High Plains feeding area,"[13] of which Logan County is a part. Additionally, he considered sales of ten other feedlots located in Colorado, Kansas, Oklahoma and Texas. The taxpayer's expert thought it appropriate to use comparable sales outside the county and state, and explained that "the industry, itself, makes no distinction between state lines or county lines." He added that although no feedlots were sold in Logan County during the relevant period, and the market for feedlots throughout the High Plains feeding area was relatively inactive during that time, the market approach nonetheless provided the best means of determining the value of the property. Using the figures derived from the three approaches, the taxpayer's expert arrived at $1,350,000 as the actual value of the feedlot.

The Logan County Assessor then testified that she arrived at a valuation of the feedlot for tax assessment purposes[14] using only the cost approach, based on the estimated replacement cost of the feedlot, and where necessary, Sonnenberg's record of the original construction cost, less physical depreciation to the 1977 base year, computed by taking into account the construction date and estimated economic life of each of the various improvements constituting the feedlot.[15] This resulted in a composite depreciation of approximately 14½% from replacement cost to the 1977 base year. The assessor explained that her office did not use the income approach or the market approach in assessing the value of the property because "[w]e had no sales to compare, and we had insufficient data to

... shall be utilized for determining actual value of real property in any county of the state...." During the interim between base years, an assessor may adjust for an "unusual condition" by redetermining the valuation for assessment, *see* Ch. 429, sec. 1, § 39–1–104(11)(b)(I), 1983 Colo.Sess.Laws 1494, 1495; *Leavell–Rio Grande Central Associates v. Board of Assessment Appeals,* 753 P.2d 797, 800 (Colo.App.1988), but economic conditions arising after the base year may not be considered in adjusting the base year value of real property, *Carrara Place, Ltd. v. Board of Equalization,* 761 P.2d 197, 201 (Colo.1988). "Unusual conditions" are limited to the installation of an on-site improvement, addition to or remodeling of a structure, change of use of the land, creation of condominium ownership, new regulations restricting or increasing the use of the land, acts of nature, and damage due to fire, explosion, vandalism or accident. § 39–1–104(11)(b)(I); *see LaDuke v. CF & I Steel Corp.,* 785 P.2d 605, 609 (Colo.1990).

11. The taxpayer's expert testified that economic conditions are volatile in the cattle-feeding business and that throughout the industry, feedlots generated a profit in only four of the eleven years preceding his testimony. In addition, he maintained that feedlots experience an accelerated depreciation in their first year of operation, "similar to driving a car out of the showroom."

12. The market approach, or comparable sales method, involves an analysis of sales of comparable properties in the market. *Cf. Board of Assessment Appeals v. Colorado Arlberg Club,* 762 P.2d 146, 151 (Colo.1988) ("market value is 'what a willing buyer would pay a willing seller under normal economic conditions'") (quoting *May Stores Shopping Centers, Inc. v. Shoemaker,* 151 Colo. 100, 110, 376 P.2d 679, 683 (1962)). It has been described as the most accurate method of determining market value. *Real Estate Taxation, supra* note 8, at 1430–32; *see also Colorado Arlberg Club,* 762 P.2d at 154.

13. According to the taxpayer's expert, the High Plains feeding area consists of Colorado, Oklahoma, and parts of Nebraska, Kansas and Texas.

14. Presumably, $3,576,070, although the assessor did not mention the specific figure in her testimony. *See supra* note 2.

15. In determining the estimated economic life of the structures making up the feedlot, the assessor made use of tables in "Assessor's Handbook 523," a manual distributed by the State Division of Property Taxation.

do an income approach,"[16] leaving the cost approach as the best means of valuing the property. The assessor testified that she was unable to find comparable sales within Logan County and, finding none, did not look outside the county or make any further effort to obtain the data necessary to apply the market approach. She agreed, however, that where a market may be discerned, the market approach is the best indicator of a property's actual value.

In calculating the value of the feedlot under the cost approach, the assessor used approximately the same replacement cost figures as the taxpayer's expert, but arrived at a final figure almost three times higher by limiting depreciation to *physical* depreciation based on the expected economic life of the improvements rather than taking into account *economic* obsolescence, which was the primary basis for the 65% depreciation considered appropriate by the taxpayer's expert. The latter defended the 65% depreciation rate as justified by the depressed economic conditions of the market at the relevant time. The assessor acknowledged that economic depreciation is a valid factor to consider in arriving at a property's value. She did not consider economic depreciation in this case, however, because she found no comparable sales within the county and lacked other data on market value.[17]

The taxpayer attempted twice during the hearing to introduce evidence of the actual value assigned to feedlots in other counties for assessment of property taxes. On each occasion, the Board sustained the county's general objection to the effect that the proffered evidence was irrelevant. The taxpayer then made an offer of proof out of the presence of the Board that two witnesses would have testified as to their examination of the tax assessment records for the 1985 tax year in Weld, Otero and Morgan counties, where they found four feedlots that had been determined to have far lower valuations for assessment purposes on a per-head capacity basis than the Logan County Assessor had assigned to the taxpayer's feedlot.[18]

In closing arguments to the Board, Logan County represented that the Board was precluded by the sales ratio statute, § 39-1-103(8)(d), 16B C.R.S. (1982), from considering the market approach to valuation because there were fewer than 30 comparable sales within the county during the relevant two-year period. The taxpayer then asserted in rebuttal that the feedlot was a special use property to which the sales ratio statute did not apply.

The Board unanimously denied the relief sought. Explaining that it found the 65% depreciation factor used by the taxpayer's expert to value the property under the cost approach "unacceptable," the Board determined that the assessor had properly valued the feedlot.

The taxpayer appealed to the Logan County District Court, which affirmed the Board's decision. The district court based

---

16. Although the taxpayer's expert performed an income approach analysis as part of his appraisal, none of the parties now contends that the income approach is a reliable indicator of value in this case. Inferentially, one reason is that the volatile economics of the commercial cattle feedlot business makes income from such a business unstable and unpredictable. The assessor also questioned the reliability of income information available to her.

17. Use of the $1,344,000 estimated value under the market approach results in a valuation of $48 per head based on the 28,000 head capacity of the feedlot; sales of the two most comparable feedlots during the relevant time period were in the $32–$48 per head range. By contrast, the $3,576,070 actual value placed on the feedlot by the Logan County Assessor using the cost approach results in a valuation of $128 per head.

18. In its offer of proof, the taxpayer stated that one witness would have testified that in tax year 1985, the 20,000–head capacity Farr Feedlot, built in 1973, was determined to have an actual value of $820,344 by the county assessor and the 70,000–head capacity Monfort Feedlot, built in the same year, was determined to have an actual value of $1,145,620. Both feedlots were located in Weld County. The assessor's records in Otero County would show that the 25,000–head capacity Colorado Feeders lot, with unspecified completion date, was determined to have an actual value of $760,310. The taxpayer's witness would have testified that according to the assessor's records for Morgan County, the 35,-000–head capacity Kennedy Feedlot, again with unspecified building date, was valued by the assessor at $325,000.

its decision in part on Logan County's argument that the sales ratio statute, § 39–1–103(8)(d), barred use of the market approach in this case because there were fewer than 30 comparable sales within the county during the relevant time period, calling the statute a "formidable obstacle."

The taxpayer sought further appellate review in the Colorado Court of Appeals, which reversed the judgment of the district court and remanded the case with directions that it be further remanded to the Board for rehearing. The court of appeals held that the district court's reliance on the sales ratio statute was misplaced, and consequently that the Board was required to give appropriate consideration to the property's value under the market approach. Furthermore, given the lack of comparable feedlot sales in Logan County, the Board's failure to consider the taxpayer's evidence of the market value of feedlots located elsewhere was an abuse of discretion. The court of appeals also concluded that the assessor gave *no* consideration to approaches to valuation other than the cost approach, and that the evidence would not support a finding that *appropriate* consideration was given to all three approaches, as required by *Montrose Properties, Ltd. v. Board of Assessment Appeals*, 738 P.2d 396 (Colo.App.1987). Finally, the court of appeals agreed with the taxpayer that evidence of feedlot assessments in nearby counties was relevant and should not have been excluded by the Board.

## II.

We must determine whether the Board applied the proper criteria in determining the actual value of the feedlot for tax year 1985. This requires review of the Board's decision to determine whether it utilized the market approach to any extent. If it did not, we must determine whether the Board nonetheless met the requirement of according "appropriate consideration" to the market approach by finding an absence of competent evidence of comparable sales within Logan County or the broader relevant market, or some other deficiency in the evidentiary record of comparable sales.

## A.

The determination of the valuation of most commercial property, including the feedlot at issue in this case, for purposes of arriving at the amount of taxes to be assessed against the property, begins with the county assessor's determination of the property's actual value. This value is to be determined by "appropriate consideration" of the three approaches to real property valuation—the cost approach, market approach and income approach. § 39–1–103(5)(a); *LaDuke v. CF & I Steel Corp.*, 785 P.2d 605, 607–08 (Colo.1990); *see also* Colo. Const. art. X, § 3(1)(a). For tax year 1985, actual value is calculated as of the calendar year immediately preceding the statutorily-mandated "base year." § 39–1–104(9)(c), 16B C.R.S. (1982).[19] The base year for purposes of the valuation at issue here is 1977. § 39–1–104(10)(a), 16B C.R.S. (1982).[20] The property is then assigned a "valuation for assessment," representing a percentage of the actual value. *See* § 39–1–104(1), 16B C.R.S. (1989 Supp.); *see generally LaDuke*, 785 P.2d at 608. Taxes are then levied by the board of county commissioners against the valuation for assessment. *See* § 39–1–111, 16B C.R.S. (1989 Supp.).

■ At each stage of the proceedings below, Logan County argued that only the cost approach to valuation need be considered, due to a lack of comparable sales within the county. Additionally, the county represented to the Board and to the district court that the Board was barred by section 39–1–103(8)(d) from using the market approach. The district court expressly relied on the supposed statutory bar in affirming the Board's valuation of the feedlot. The court of appeals, however, correctly held that section 39–1–103(8)(d) is inapplicable to the present dispute. The Board has abandoned reliance on that statute on certiorari

---

**19.** Repealed, Ch. 267, sec. 5, § 39–1–104(9)(c), 1988 Colo.Sess.Laws 1269, 1270.

**20.** Repealed, Ch. 285, sec. 6, § 39–1–104(10), 1987 Colo.Sess.Laws 1388.

review [21] and instead asserts that it *did* give appropriate consideration to all three approaches to value. We find no support in the record for this contention.

■ Although the Board's findings summarized the testimony of the taxpayer's expert, its conclusions merely approved the assessor's use of the cost approach, based on replacement cost and physical depreciation. The Board also found the taxpayer's 65% depreciation factor for economic obsolescence unacceptable, without explanation. Most tellingly, the Board's final conclusion was that "the [Logan County Assessor] properly valued the subject property." That valuation was concededly based solely on the cost approach. We can discern nothing in the Board's findings and order to suggest that it gave consideration to the market approach. We conclude, therefore, that the Board's decision was based solely on evidence of the feedlot's value under the cost approach.

## B.

■ Judicial review of the Board's decision is governed by the standards set forth in section 24–4–106, 10A C.R.S. (1988), of the State Administrative Procedure Act. Ch. 302, sec. 2, § 39–8–108(1), –(2), 1985 Colo.Sess.Laws 1228, 1228–29. It is the

function of the Board, not the reviewing court, to weigh the evidence and resolve any conflicts. *Colorado Arlberg Club*, 762 P.2d at 151. A decision of the Board may be set aside, however, if it is unsupported by competent evidence or reflects a failure to abide by the statutory scheme for calculating property tax assessments. *See id.; Leavell–Rio Grande Central Associates v. Board of Assessment Appeals*, 753 P.2d 797, 799 (Colo.App.1988); § 24–4–106(7) (reviewing court must set aside agency action if, among other grounds, it is "unsupported by substantial evidence when the record is considered as a whole," "in excess of statutory ... authority, purposes, or limitations," "an abuse or clearly unwarranted exercise of discretion," or "otherwise contrary to law"). We must apply these standards in reviewing the court of appeals' holding that on the facts of this case the Board's failure to give consideration to the market approach [22] to value in making its determination was an abuse of discretion.

■ The actual value for property tax purposes of real property of the type at issue here "shall be that value determined by *appropriate consideration* of the cost approach, the market approach, and the income approach to appraisal...." § 39–1–103(5)(a) (emphasis added).[23] As

---

**21.** § 39–1–103(8)(d) provides in pertinent part as follows:

In no event shall a sales ratio be established or utilized for any class or subclass of property unless and until there have been at least thirty such coded, typical sales or at least five percent of all properties in such class or subclass within the county have been sold and verified by the assessor as coded, typical sales, whichever amount is greater....

In its closing argument to the Board, Logan County represented that the Board was barred by this statute from giving any consideration to the market approach because of the absence of the required thirty sales. That argument was carried through each stage of the proceedings below, but abandoned on appeal to this court, where it is now maintained that the Board fully considered all three approaches, notwithstanding the county attorney's argument to the Board that it was barred by statute from doing so.

The sales ratio statute applies only to sales ratio studies, which are completely unrelated to market valuations of individual properties. Sales ratio studies, also known as assessment-ratio studies, are a form of applied statistics used

by assessors, equalization agencies and appeal bodies for a number of purposes, including "to determine the need for a general reappraisal, to establish priorities for reappraisal of selected groups of properties, to identify potential problems with appraisal procedures, to trend [sic] appraisals between reappraisals, to adjust sales prices for time, and to develop depreciation factors...." International Association of Assessing Officers Assessment Standards Committee, *Standard on Assessment–Ratio Studies*, at 1 (Sept. 28, 1980); *see also Land Valuation Manual, supra* note 8, § IV, at 4.7.

**22.** Because both parties agree that the income approach to value is inappropriate in this case, we confine our analysis to consideration of the propriety of using the market approach. *See supra* note 16.

**23.** Although we confine ourselves to a discussion of the appropriate factors to be considered by the Board *de novo*, the determination to be made by the county assessor in the first instance must, of course, comport with the same statutory requirements.

the court of appeals noted in *Montrose Properties*, 738 P.2d at 397, the statute itself, by use of the term "appropriate consideration," recognizes that one or more of the three approaches may not be applicable in a particular case.

▮▮▮▮ Certainly, however, when a market exists and competent evidence is presented to the Board concerning that market, the statute mandates that the market approach be taken into consideration in determining actual value.[24] The Board may not exclude from consideration sales of comparable properties in the vicinity of the subject property merely because they are located in another county. *Platinum Properties Corp. v. Board of Assessment Appeals*, 738 P.2d 34 (Colo.App.1987) (Board abused its discretion in excluding evidence of comparable sales in another county within the same metropolitan area as the subject property). If evidence based on comparable sales outside the county and within the relevant market is properly presented to the Board, such evidence must be given further, appropriate consideration. *Cf. Colorado Arlberg Club*, 762 P.2d at 155; § 24-4-105(7), 10A C.R.S. (1988) (taxpayer has burden of presenting evidence regarding factors bearing on valuation). Failure to consider properly presented, competent evidence based on comparable sales constitutes an abuse of discretion.

▮▮▮▮ In this case, although there were no comparable feedlot sales within the county, the Board admitted the taxpayer's evidence based on comparable sales outside the county but within the High Plains market, of which Logan County is a part, indicating a nearly-threefold difference in the market value per head between the Sonnenberg feedlot and comparable feedlots within the same market.[25] The Board's failure to give appropriate consideration to this evidence was an abuse of discretion.

## III.

We next address the court of appeals' holding that the Board erred in excluding the taxpayer's proffered evidence of the actual value of four feedlots in Weld, Otero and Morgan counties as determined by assessors in those counties for the tax year 1985, for if the holding is correct a rehearing will be required rather than reconsideration based on the existing record. The evidence that would have been presented, as shown by the taxpayer's offer of proof, consisted of the assessors' determinations of the actual value of each feedlot, the valuations for property tax assessment purposes computed by applying the statutory factor to those actual values, the number of cattle each feedlot could accommodate at full capacity, and the year of construction of two of the four feedlots. From this data, the taxpayer intended to show that the four feedlots were being appraised for tax purposes at a much lower value per head of capacity than was the taxpayer's Logan County feedlot. This evidence, the taxpayer argued to the Board, was relevant to show that the Logan County Assessor's valuation of the feedlot was not consistent with the constitutional and statutory requirements of just and equalized valuations. *See* Colo. Const. art. X, § 3; Ch. 425, sec. 1, § 39-1-101, 1983 Colo. Sess.Laws 1480.

▮▮▮▮ Even if the taxpayer were correct that the issue of just and equalized valuations among counties in determining the actual value of property for tax assessment purposes is cognizable by the Board in an appeal from an assessor's valuation, the record here does not demonstrate error by the Board in excluding the proffered evidence. The offer of proof contained nothing to show that the feedlots in question were comparable to the taxpayer's feedlot

24. In 1985 a statutory amendment was enacted providing the clarification that use of the market approach "shall require a representative body of sales sufficient to set a pattern." § 39-1-103(8)(a)(I), 16B C.R.S. (1989 Supp.). This statute also makes clear that appraisals must reflect due consideration of the comparability of such sales, including the extent of the similarities and dissimilarities among properties compared for assessment purposes. This statute took effect subsequent to the 1985 tax year at issue here. Ch. 296, sec. 13, 1985 Colo.Sess. Laws 1210, 1214.

25. *See supra* at 32.

in any respect or that the assessors in other counties utilized different and more appropriate methods in arriving at valuations. Without further foundation, the fact that the valuation per head of capacity was lower for the Weld, Otero and Morgan County feedlots than for the taxpayer's Logan County feedlot had no tendency to make it more or less probable that the Logan County feedlot was overvalued. *See* CRE 401; Rule 14, Board of Assessment Appeals Rules, 8 C.C.R. § 1301-1 (1988). Accordingly, for this reason alone the Board correctly sustained the taxpayer's objection to the relevance of the proffered evidence.

More fundamentally, however, we hold that the issue of just and equalized valuation among the various counties is not cognizable in an appeal to the Board from an assessor's determination of property valuation. The equality of valuation requirement has its source in Article X, section 3, of the Colorado Constitution, which provides in relevant part:

All taxes shall be uniform upon each of the various classes of real and personal property located within the territorial limits of the authority levying the tax, and shall be levied, assessed, and collected under general laws, which shall prescribe such methods and regulations as shall secure just and equalized valuations for assessments of taxes upon all property, real and personal, located within the territorial limits of the authority levying the tax....

The statutes concerning valuation of property by assessors, review by county boards of equalization, and appeals to the Board challenging such valuations, contain no suggestion that the assessor or the Board is to compare valuations with those made for comparable properties in other counties and make adjustments to achieve equality. *See generally* §§ 39-1-101 to -120, and 39-8-101 to -109, 16A C.R.S. (1982 & 1989 Supp.). Rather, the constitutional scheme for achieving just and equalized valuations requires that taxes be "levied, assessed, and collected under general laws, which shall prescribe such methods and regula-

tions as shall secure just and equalized valuations for assessments of taxes upon all property, real and personal, located within the territorial limits of the authority levying the tax." Colo. Const. art. X, § 3. Pursuant to this constitutional requirement, the general assembly enacted section 39-1-103, prescribing standards and requirements for valuing property for assessment purposes, and section 39-2-109(1)(e), 16B C.R.S. (1989 Supp.), requiring the property tax administrator to prepare and publish manuals, appraisal procedures, and instructions "concerning methods of appraising and valuing land, improvements ... and to require their utilization by assessors in valuing and assessing taxable property." Under this authorization, the Division of Property Taxation of the Department of Local Affairs has issued a Land Valuation Manual further elaborating the methods and criteria to be employed in the appraisal process. Additional safeguards are found in the statutes permitting county boards of equalization to adjust valuations for assessment within the county "to the end that all valuations for assessment of property are just and equalized within the county," § 39-8-102(1), 16B C.R.S. (1982), provisions authorizing the state board of equalization to correct prospectively any valuations of classes or subclasses of property not valued pursuant to law, § 39-9-103(4), 16B C.R.S. (1989 Supp.), and provisions in Article X, section 3, of the Colorado Constitution for annual studies to determine compliance with the constitutional and statutory standards for valuation and to correct any deviations prospectively.

It is through adherence to the criteria and procedures set forth in the statutes and regulations and through the availability of judicial review to assure such adherence that the constitutionally contemplated just and equalized valuations are to be achieved. The cumbersome process suggested by the taxpayer of introducing before the Board evidence of valuations of comparable properties in other counties has no place in the constitutional and statutory scheme to achieve just and equalized valuations for assessment of property taxes.

We affirm that portion of the judgment of the court of appeals determining that the Board abused its discretion in failing to consider the market approach in valuing the feedlot. We reverse that part of the judgment determining that the Board erred in excluding evidence of assessors' valuations of feedlots in other counties. Accordingly, we remand the case to the court of appeals for further remand to the district court and then to the Board for reconsideration on the existing record or, in the Board's discretion, for rehearing.