2013 COA 30

**CTS INVESTMENTS, LLC,**
Petitioner–Appellant,

v.

**GARFIELD COUNTY BOARD OF EQUALIZATION, Respondent–Appellee,**

and

Board of Assessment Appeals, Appellee.

No. 12CA0677

Colorado Court of Appeals,
Div. II.

Announced March 14, 2013

Atkinson Boyle, PLLC, J. Aaron Atkinson, Littleton, Colorado, for Petitioner–Appellant

Frank Hutfless, County Attorney, Cassandra L. Coleman, Assistant County Attorney, Glenwood Springs, Colorado, for Respondent–Appellee

Opinion by JUDGE CASEBOLT

¶ 1 In this property tax case, petitioner, CTS Investments, LLC (CTS), appeals the order of the Board of Assessment Appeals (BAA) denying its petition challenging the valuation placed on its property by respondent, Garfield County Board of Equalization (BOE), for the 2011 tax year. CTS asserts that the BAA erred by admitting hearsay evidence, finding one of its proposed comparable sales was not an arm's-length transaction, and upholding the BOE's valuation when there was no competent evidence in the record to support the determination. We disagree and thus affirm.

## I. Background

¶ 2 CTS owns two parcels of vacant land in Garfield County. One consists of 10.766 acres, and the other consists of 61.26 acres. Both are located within the 640–acre Castle Valley Ranch Planned Unit Development in the town of New Castle.

¶ 3 For the 2011 tax year, the BOE valued the 10.766 acre property at $307,800, or roughly $28,500 per acre, and valued the 61.26 acre property at $1,836,480, or roughly $30,000 per acre.

¶ 4 CTS asserted to the BAA that the property should be valued at approximately $2,200 per acre. It based its petition in large part upon a sale of property adjoining its own in Castle Valley Ranch that had occurred in April 2010. In that transaction, GMAC ResCap, a national mortgage lender, sold to CVR Investors, Inc. (CVR), approximately 120 acres of vacant land and 13 finished townhome lots for $700,000 (CVR sale). GMAC ResCap had acquired the property essentially through foreclosure of its $15 million loan to Village Homes, the previous owner. Of note, Village Homes had purchased the property from CTS in 2007 and 2008 for approximately $8.9 million. At the time of the foreclosure, the GMAC ResCap loan to Village Homes had an outstanding principal balance of over $10 million.

¶ 5 GMAC ResCap first listed the property in June 2009 for $2 million. In October 2009, it reduced the listing to $1,667,000. Ultimately, in April 2010, CVR agreed to purchase the property for $1,067,000, which was later reduced by agreement of the parties to $700,000.

¶ 6 In its appeal to the BAA, CTS asserted that the CVR sale was the most comparable sale for the purpose of determining the actual value of its property. It argued that the CVR sale was an arm's length transaction and, thus, should be considered to reflect the actual value of its property. The county assessor, however, excluded the sale from her appraisal, concluding that the sale was not appropriate for consideration because it was not an arm's length transaction, due to, primarily, her opinion that GMAC ResCap was under duress when it sold the property. The assessor's report, admitted into evidence, included a section setting forth her reasons for concluding that the CVR sale was not an arm's-length transaction, and she testified at the hearing regarding the issue.

¶ 7 It is undisputed that it was appropriate for the assessor to use only the market approach, and not the income or cost approaches, to determine the properties' actual value. Based on the market approach, the assessor testified that the actual value of the properties was $30,000 per acre. She testified that to reach this result, she compiled four comparable sales and, as required by statute, adjusted them for time, size, and location. Her comparable sales were, however, completed before the applicable one-and-a-half-year base period—January 1, 2009 to June 30, 2010. She testified that she did so because she concluded that the CVR sale was not an arm's-length transaction, and thus, there were no comparable sales completed during the base period.

¶ 8 In addition to the county assessor's evidence, the BAA heard testimony from

CTS's tax consultant; a real estate agent who had represented GMAC ResCap in the CVR sale; and representatives from both CTS and CVR. CTS's tax consultant provided an appraisal using comparable sales and concluded that the actual value of the property was $2,232 per acre, which was the adjusted sale price of the CVR sale after the thirteen finished townhome lots were excluded. Unlike the assessor, he considered the CVR sale an arm's-length transaction and, therefore, included it in his valuation. The consultant did not believe that, given the depressed nature of the market, the sale was atypical.

¶ 9 The BAA denied CTS's petition. In its order, the BAA stated that it found the assessor's valuation to be more persuasive than that of CTS, and it agreed with the assessor's decision not to consider the CVR sale because it did not meet the definition of an arm's-length transaction. However, the order did not include the BAA's reasoning for that ruling.

¶ 10 CVR also had appealed the BOE's determination of the 2011 value of its property. CTS's and CVR's appeals were consolidated and were jointly heard by the BAA, and CVR has also appealed the BAA's determination to this court. We separately resolve that appeal in *CVR Investors, Inc. v. Garfield County Board of Equalization*, 2013 WL 980132 (Colo.App. No. 12CA0678, Mar. 14, 2013) (not published pursuant to C.A.R. 35(f)).

## II. Admission of Hearsay Evidence

¶ 11 CTS asserts that the BAA erred in admitting into evidence the articles and material the assessor relied on in concluding that GMAC ResCap was under duress when it sold the property to CVR. Because resolution of this issue affects whether there is competent evidence in the record to support the BAA's decision not to consider the CVR sale an arm's-length transaction, we will address it first. We reject the contention.

### A. Standard of Review and Applicable Law

¶ 12 Administrative hearings need not comply with the strict rules of evidence.

*Partridge v. State*, 895 P.2d 1183, 1187 (Colo. App.1995). However, a hearing officer may only consider competent evidence. *117th Assocs. v. Jefferson Cnty. Bd. of Equalization*, 811 P.2d 461, 463 (Colo.App.1991).

¶ 13 Hearsay is admissible in administrative proceedings if it possesses probative value commonly accepted by reasonable and prudent persons in the conduct of their affairs. § 24–4–105(7), C.R.S.2012; *Craddock v. Colo. St. Bd. of Assessment Appeals*, 819 P.2d 1100, 1103 (Colo.App.1991). The Colorado Supreme Court has set out nine factors that are instructive in determining whether hearsay evidence is reliable, trustworthy, and probative for the purposes of an administrative hearing:

(1) whether the [hearsay] statement was written and signed; (2) whether the statement was sworn to by the declarant; (3) whether the declarant was a disinterested witness or had a potential bias; (4) whether the hearsay statement is denied or contradicted by other evidence; (5) whether the declarant is credible; (6) whether there is corroboration for the hearsay statement; (7) whether the case turns on the credibility of witnesses; (8) whether the party relying on the hearsay offers an adequate explanation for the failure to call the declarant to testify; and, finally, (9) whether the party against whom the hearsay is used had access to the statements prior to the hearing or the opportunity to subpoena the declarant.

*Indus. Claims Appeals Office v. Flower Stop Mktg. Corp.*, 782 P.2d 13, 18 (Colo.1989) (citations omitted) (stating that these factors should not be interpreted as a mandatory checklist).

¶ 14 A party generally must first raise an objection in the administrative proceeding to preserve a contention for appeal. *See JW Constr. Co. v. Elliott*, 253 P.3d 1265, 1271 (Colo.App.2011).

### B. Application

#### 1. Preservation

¶ 15 Here, to the extent CTS asserts the BAA erred in admitting testimony by the

assessor concerning the financial condition of GMAC and its mortgage lending subsidiary GMAC ResCap, we decline to address the contention because CTS did not object to that testimony before the BAA. Instead, the assessor testified without objection, among other things, that GMAC received an initial "bailout" of $5 billion from the federal government's Troubled Asset Relief Program (TARP); that it failed its Supervisory Capital Assessment Program review and was ordered to secure $1.9 billion of new capital; that GMAC ResCap, as of the end of 2009, was starting to explore strategic alternatives, including its sale; that GMAC ResCap had been provided $2.7 billion to support its continuation; and that in March 2010, the ResCap board commenced actively marketing ResCap for sale, at which point the federal government had advanced $17.2 billion to GMAC.

¶ 16 However, CTS objected to the introduction of various articles attached to the assessor's appraisal discussing the financial status of GMAC ResCap and GMAC. Accordingly we will limit our review to the admission of those materials.

### 2. Written Materials

¶ 17 Here, the assessor based her decision not to consider the CVR sale an arm's-length transaction on, in part, news articles discussing the financial status of GMAC ResCap and GMAC. These articles were compiled from various established general and financial news outlets, including Bloomberg, and included information that, in 2008 and 2009, the federal government provided GMAC with billions of dollars from TARP to prevent the company from failing; that, in 2009, the government instructed GMAC to raise billions of dollars in capital; and that GMAC ResCap was struggling to sell its mortgage-related assets, which were a drag on the financial stability of GMAC.

¶ 18 Each written article, with one exception, included the author's name. Because none of the articles specifically referenced the CVR sale, it can be inferred that the authors were not biased concerning the parties to the transaction. Also, some of the articles made the same or similar assertions.

Furthermore, given the nature of this controversy, it is understandable that the authors were not called to testify.

¶ 19 In addition, it appears that CTS had sufficient access to the statements before the BAA hearing, because they had been included in the assessors' report, which had been issued at least eight months before the BAA hearing began. Furthermore, much of the information contained in the articles had already been admitted without objection through the assessor's testimony.

¶ 20 These factors all provide support for the BAA's implicit conclusion that the financial articles were of the nature commonly relied upon by reasonable and prudent persons in gathering information about the financial status of large companies. *See* § 24–4–105(7). Thus, we conclude that the BAA did not abuse its discretion in admitting the articles.

### III. Arm's–Length Transaction

¶ 21 CTS contends that, by not considering the CVR sale because it did not qualify as an arm's-length transaction, the BAA refused to compile a representative body of comparable sales and, thus, erred as a matter of law. We disagree.

### A. Standard of Review

¶ 22 Before the BAA, a taxpayer bears the burden to show that the assessor's valuation is incorrect. *Cantina Grill, JV v. City & Cnty. of Denver Bd. of Equalization*, 2012 COA 154, ¶ 44, 292 P.3d 1144.

¶ 23 Judicial review of the BAA's decision is governed by the standards set forth in section 24–4–106, C.R.S.2012. *See* § 24–6–106(7), C.R.S.2012 (reviewing court must set aside agency action if, among other grounds, it is unsupported by substantial evidence when the record is considered as a whole; in excess of statutory authority, purposes, or limitations; an abuse or clearly unwarranted exercise of discretion; or otherwise contrary to law).

¶ 24 It is for the BAA, not a reviewing court, to weigh the evidence and resolve any conflicts. *Bd. of Assessment Appeals v.*

*E.E. Sonnenberg & Sons, Inc.,* 797 P.2d 27, 34 (Colo.1990). We may not set aside a decision by the BAA as to the appropriate valuation unless it is unsupported by any competent evidence or reflects a failure to abide by the statutory scheme for calculating property tax assessments. *Id.* (citing *Bd. of Assessment Appeals v. Colo. Arlberg Club,* 762 P.2d 146, 151 (Colo.1988)); *Leavell–Rio Grande Cent. Assocs. v. Bd. of Assessment Appeals,* 753 P.2d 797, 799 (Colo.App.1988).

■ ¶ 25 "For purposes of judicial review of administrative decisions, competent evidence is the same as substantial evidence." *Burns v. Bd. of Assessment Appeals,* 820 P.2d 1175, 1176 (Colo.App.1991). The substantial evidence standard requires that there be more than merely "some evidence in some particulars" to support the Board's decision. *Id.* (quoting *Whelden v. Bd. of Cnty. Comm'rs,* 782 P.2d 853, 856 (Colo.App.1989)).

■ ¶ 26 Although the Board's decision must be supported by the record, the Board's findings of fact may be express or implied. *Colo. Arlberg Club,* 762 P.2d at 150; *Burns,* 820 P.2d at 1177. Findings must be adequate to apprise the parties and a reviewing court of the basis of the Board's decision. *Colo. Arlberg Club,* 762 P.2d at 150; *Burns,* 820 P.2d at 1177. However, "the absence of findings by an administrative board is not fatal to a decision if there is evidence in the record which supports its decision." *Colo. Arlberg Club,* 762 P.2d at 150; *Burns,* 820 P.2d at 1177.

### B. Applicable Law

¶ 27 An assessor has a duty to determine the actual value of all real property for property tax purposes. § 39–1–103(5)(a), C.R.S. 2012; *El Paso Cnty. Bd. of Equalization v. Craddock,* 850 P.2d 702, 704 (Colo.1993). Actual value shall be determined "by appropriate consideration of the cost approach, the market approach, and the income approach to appraisal." § 39–1–103(5)(a). However, the nature of the property being appraised or the lack of sufficient data may rule out consideration of one or more of these approaches. *Creekside at DTC, Ltd. v. Bd. of Assessment Appeals,* 811 P.2d 435, 438 (Colo. App.1991).

■ ¶ 28 When considering the market approach, the following limitations and conditions apply:

Use of the market approach shall require a representative body of sales, including sales by a lender or government, sufficient to set a pattern, and appraisals shall reflect due consideration of the degree of comparability of sales, including the extent of similarities and dissimilarities among properties that are compared for assessment purposes. In order to obtain a reasonable sample and to reduce sudden price changes or fluctuations, all sales shall be included in the sample that reasonably reflect a true or typical sales price during the period specified in section 39–1–104(10.2).

§ 39–1–103(8)(a)(I), C.R.S.2012. All properly presented, competent evidence of comparable sales must be considered, and failure to consider such evidence constitutes an abuse of discretion. *E.E. Sonnenberg & Sons, Inc.,* 797 P.2d at 35; *Platinum Props. Corp. v. Colo. Bd. of Assessment Appeals,* 738 P.2d 34, 35–36 (Colo.App.1987).

¶ 29 When valuing vacant land, an assessor shall also take into account "the anticipated market absorption rate, the size and location of such land, the direct costs of development, any amenities, any site improvements, access, and use." § 39–1–103(14)(b), C.R.S. 2012; *Craddock,* 850 P.2d at 704.

¶ 30 In *C.P. & Son, Inc. v. Board of County Commissioners,* 953 P.2d 1303 (Colo.App. 1998), a taxpayer appealed the judgment of the trial court rejecting the taxpayer's challenge to the valuation of twenty vacant residential lots by the county assessor. The taxpayer asserted that the trial court erred in finding that the sale involving the taxpayer's purchase of the subject property was not entitled to much weight in a sales comparison analysis because the transaction was not completed at arm's-length. *Id.* at 1305. Citing the third volume of the *Assessor's Reference Library (ARL)* at Addendum III–B, a division of this court stated that "sales which do not qualify as arms-length transactions are not appropriate for comparison in a market analysis." *Id.*

¶ 31 The division acknowledged that the taxpayer had presented evidence at trial that the sale was in fact an arm's-length transaction; however, the division stated that "the trial court was persuaded by the assessor's testimony that abnormal pressures were involved in the sale because of the lack of success of the subdivision project and the seller's desire to remove itself from the project." *Id.* The division concluded that, because there was ample evidence in the record to support the trial court's finding that the sale was not appropriate for consideration, it would not disturb that finding on review. *Id.*

¶ 32 Neither *C.P. & Son, Inc.* nor any other Colorado case or statute directly addresses the meaning or definition of "arm's-length transaction" in the context of tax valuation. Thus, we will look to other sources to aid us in determining whether the BAA erred in concluding that the CVR sale was not an arm's-length transaction.

¶ 33 To guide the state's assessors in valuing property, the property tax administrator has a statutory duty to prepare and publish manuals, appraisal procedures, and instructions concerning methods of appraising, based upon the three statutorily mandated approaches to appraisal. § 39–2–109(1)(e), C.R.S.2012; *Craddock*, 850 P.2d at 704. To fulfill this duty, the Division of Property Taxation has published the *ARL*. Volume 3 of the *ARL* concerns land valuation. Although not binding on reviewing courts, the *ARL* is binding on assessors. *Huddleston v. Grand Cnty. Bd. of Equalization*, 913 P.2d 15, 17 (Colo.1996).

¶ 34 In accordance with section 39–1–103(8)(a)(I) and Colorado case law, the *ARL* states that only qualified sales should be considered as comparable sales in determining the value of property for taxation purposes. *ARL* 3.7–8 (2012). "Since values can be distorted by inclusion of any non-arm's-length sales in the appraisal process, these sales should generally not be used for market analysis and should never be used in statistical analysis or to set values. Therefore, these sales should be disqualified during the sales confirmation process." *Id.* at 3.7.

¶ 35 The *ARL* emphasizes that, "[w]hen sales are relatively scarce, it is absolutely essential that each sale be carefully analyzed for the purpose of collecting as many arm's-length sales as possible. It is extremely important that all sales be confirmed before they are used to determine appraised values...." *Id.* at 3.6. In addition, sales by a lender of foreclosed properties it owns (REO sales), such as the CVR sale here, should initially be considered arm's-length transactions, but may be disqualified as non-arm's-length for reasons applied to other types of sales. *Id.* at 3.17.

¶ 36 Addendum III–B, cited in *C.P. & Son, Inc.*, deals with nonqualifying sales. It lists various reasons why a sale should not be considered an arm's-length transaction. *Id.* at add. III–B. Each reason has a corresponding code, running from numbers 51 through 70. *Id.* Numbers 51 through 69 do not apply to the particular sale involved here, but the final reason listed, # 70, is labeled "other," and the addendum notes that "[s]ales disqualified under # 70 must be extensively documented as to the reason the sale has been determined non-arm's length." Because a sale may be disqualified under "other," the list in the addendum does not assist us in resolving whether the BAA erred in disqualifying the CVR sale as non-arm's-length.

¶ 37 The *ARL* provides a definition of "arm's-length transaction" from American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 305 (13th ed. 2008): "A transaction between unrelated parties under no duress." *ARL* 3.13; *cf. Colorado Arlberg Club*, 762 P.2d at 151 (defining "market value" as "what a willing buyer would pay a willing seller under normal economic conditions" (collecting cases) and quoting *The Appraisal of Real Estate* 305 definition: "[t]he most probable price ... for which the appraised property will sell in a competitive market ... with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under *undue duress*" (emphasis added)).

¶ 38 However, the *ARL* does not define "duress." Furthermore, no Colorado case or statute defines "duress" in this context. In addition, the authorities cited by CTS only

define "duress" in the context of voiding a contract and, therefore, are neither binding nor persuasive with regard to tax valuation. *See Lakeside Avenue L.P. v. Cuyahoga Cnty. Bd. of Revision*, 75 Ohio St.3d 540, 664 N.E.2d 913, 916–17 (1996) (rejecting contention that definition of "duress" for property tax purposes should be the same as that governing the avoiding of contracts).

¶ 39 While the *ARL* does not directly define the term, it nevertheless appears to equate "duress" with "stimulus." For example, in a section titled "Final Analysis," it notes that "when qualifying a sale, the following questions should be considered." It then asks whether the transaction meets the definitions of "market value" and "arm's length transaction" and quotes a provision from *Property Assessment Valuation, 2010* that defines market value this way:

> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably and assuming the price is not affected by *undue stimulus*.

*ARL* 3.13. (emphasis added). It then notes that implicit in this definition is a sale in which the buyer and seller are "typically motivated." *Id.*

¶ 40 In *Strongsville Board of Education v. Cuyahoga County Board of Revision*, 112 Ohio St.3d 309, 859 N.E.2d 540 (2007), the Ohio Supreme Court stated that an arm's-length transaction, for property tax assessment purposes, must possess three primary characteristics: "[I]t is voluntary, i.e., without compulsion or duress; it generally takes place in an open market; and the parties act in their own self-interest." 859 N.E.2d at 542 (quoting *Walters v. Knox Cnty. Bd. of Revision*, 47 Ohio St.3d 23, 546 N.E.2d 932, 935 (1989)). The court emphasized that the absence of even one of the factors is sufficient to demonstrate that a sale was not conducted at arm's-length. *Id.* at 542–43. It also stated that a transaction conducted under duress is characterized by "compelling business circumstances ... clearly sufficient to establish that a recent sale of property was neither arm's-length in nature nor repre-

sentative of true value," and that a finding of duress lies within the province of the fact finder, which a reviewing court will uphold as long as the record contains sufficient support for it. *Id.* at 543 (quoting *Lakeside Avenue*, 664 N.E.2d at 919).

¶ 41 In *Strongsville* the seller sold an office building to the taxpayer to avoid defaulting on a balloon payment due on the building's mortgage. *Id.* The Board of Tax Appeals concluded that the sale was not an arm's-length transaction because the seller was under duress. *Id.* There was evidence that the seller was "compelled to enter into [the transaction] because it needed to raise capital quickly." *Id.* at 544. The seller even rejected a higher offer because it would have taken a longer time to complete that potential sale. *Id.* at 543. The court held that, based on the circumstances surrounding the sale, there was sufficient evidence to support the board's finding that the sale was not an arm's-length transaction, and thus, the board did not abuse its discretion.

¶ 42 We view the *Strongsville* definition of "arm's-length transaction" and its concept and examples of duress as helpful and persuasive. The Ohio Supreme Court's holding is in accord with the *ARL*'s definitions and concepts of duress being similar to undue stimulus, and with the holding of *C.P. & Son, Inc.*, where a division of this court held that, because "abnormal pressures" were involved in the sale of the property due to the lack of success of the development and the seller's desire to remove itself from the project, the trial court did not err in finding the transaction was not at arm's-length. 953 P.2d at 1305; *see Columbus City Sch. Dist. Bd. of Educ. v. Franklin Cnty. Bd. of Revision*, 2012–Ohio–5680, ¶¶ 28–31, 134 Ohio St.3d 529, 983 N.E.2d 1285 (holding that property owner acted under duress in selling property because owner was deeply in default on mortgage loan; stating that a mortgage default raises specter of imminent foreclosure, which is evidence that the seller is not a typically motivated participant; and holding that "[t]he standard of duress is whether compelling circumstances lead to the parties consummating a transaction whose terms

would likely be unacceptable to a typically motivated seller or buyer").

## C. Application

### 1. Standard of Review

¶ 43 Preliminarily, CTS asserts that the BAA's conclusion that the CVR sale was not an arm's-length transaction involves a question of law that we must review de novo. We are not persuaded.

¶ 44 The determination whether the CVR sale was an arm's-length transaction presented a question of fact. *See Steamboat Ski & Resort Corp. v. Routt Cnty. Bd. of Equalization,* 23 P.3d 1258, 1260 (Colo.App.2001) ("The determinations as to the degree of comparability of this sale and any adjustments to be made in using it were ... questions of fact for the BAA to decide."); *C.P. & Son, Inc.,* 953 P.2d at 1305; *Creekside at DTC, Ltd.,* 811 P.2d at 437 ("Whether the properties are sufficiently similar to have some bearing on the value under consideration, and to be of any aid to the jury, must necessarily rest in the sound discretion of the trial court which will not be interfered with unless abused.") (quoting *State Dep't of Highways v. Town of Silverthorne,* 707 P.2d 1017, 1021 (Colo.App.1985)); *see also Strongsville,* 859 N.E.2d at 543. Thus, as long as the BAA's determination is supported by evidence in the record, and it applied the appropriate legal principles, we will not disturb its ruling on appeal. *C.P. & Son, Inc.,* 953 P.2d at 1305; *see also Strongsville,* 859 N.E.2d at 543–44.

### 2. Record Support

¶ 45 The record presents conflicting evidence on this issue.

¶ 46 The real estate agent who represented GMAC ResCap in the CVR sale testified that it was an arm's-length transaction and that the seller was not under undue pressure from the federal government to sell the property. He also testified that the property was widely marketed, and that given the depressed nature of the market, it would have been unlikely that the property could have sold for more. In addition, the agent stated that the listing price of the property was based upon the values of finished lots and vacant land in the market. Furthermore, CTS's property tax consultant testified that the CVR sale was an arm's-length transaction, and a representative for CVR testified that, in his opinion, GMAC was not under undue duress.

¶ 47 The county assessor, however, concluded that the CVR sale was not an arm's-length transaction. The assessor included a section in her appraisal report, which was admitted into evidence, detailing why the assessor's office decided against qualifying the sale. The report cited news articles, attached to the report, regarding the financial situation of GMAC and its mortgage subsidiary, GMAC ResCap, prior to and at the time of the CVR sale.

¶ 48 The assessor opined that GMAC was under enormous pressure from the federal government to liquidate its troubled assets. The assessor asserted that these assets included the property at issue in the CVR sale because it was a development property whose multi-million dollar loan was in delinquency. As noted previously, the report detailed that, in 2008 and 2009, the federal government provided GMAC with billions of dollars from TARP to prevent the company from failing; that, in 2009, the government instructed GMAC to raise billions of dollars in capital; and that GMAC ResCap was struggling to sell its mortgage-related assets, which were a drag on the financial stability of GMAC. The report stated that the CVR sale was not typical even for a REO sale, and that the transaction was a misleading sale for determining the fair market value of CTS's property. The assessor asserted that the sale price per acre of the CVR sale—approximately one-third of the listed price of the next lowest development property in the county—"was not even in the range" of contemporary listings of raw land, and this indicated that GMAC was not a typically motivated seller. Furthermore, she noted the price reductions that had followed the property's initial listing price, providing evidence of atypical motivation. In short, the appraisal report concluded that GMAC was "struggling for survival" and needed to sell the

property. The assessor's testimony reflected the assertions made in the report.

¶ 49 In our view, the assessor's report and testimony are sufficient to justify a conclusion that the circumstances surrounding the CVR sale rendered it a sale under duress, and the BAA applied the appropriate legal principles. Accordingly, the BAA did not abuse its discretion in deciding to credit the assessor's report and testimony as establishing that the recent sale of the CVR property was neither arm's-length in nature nor representative of true value.

¶ 50 CTS correctly points out the appraiser's acknowledgment that none of the articles she cited in support of her conclusion that GMAC ResCap sold the property under duress specifically referenced the property in question, and that she did not speak with anyone from the federal government, GMAC, GMAC ResCap, or any of the real estate agents involved in the sale. However, the credibility of the witnesses and the weight to be given their testimony is solely in the BAA's discretion. *E.E. Sonnenberg & Sons, Inc.*, 797 P.2d at 34.

¶ 51 We find further support for our conclusion in comparing the facts and circumstances of this case to those in *C.P. & Son, Inc.* and *Strongsville*. In both of those cases, as here, there was evidence that the sellers faced significant financial pressures to sell their properties. The court in *C.P. & Son, Inc.*, did not describe in detail the assessor's testimony. 953 P.2d at 1305. However, the court stated that the taxpayer, like CTS, presented evidence that the sale was in fact an arm's-length transaction, but the trial court was ultimately persuaded by the assessor's testimony that the sale involved abnormal pressures because of the lack of success of the subdivision project and the seller's desire to remove itself from the project. *Id.* Here, as described above, the assessor presented similar evidence, and we can infer from the BAA's order that it was persuaded to credit that evidence.

¶ 52 As in *Strongsville*, there was evidence here that the seller needed to raise capital. The assessor presented evidence that GMAC ResCap had inadequate capital reserves. Furthermore, whereas the seller in *Strongs-*

*ville* realized a gain on the sale even though it rejected a higher offer, 859 N.E.2d at 543–44, GMAC ResCap, in selling the property to CVR, suffered a multi-million dollar loss on the original loan it had made. In our view, this steep loss supports a finding that GMAC ResCap was under economic duress when it sold the property and was not a typically motivated seller. *See Columbus City Sch. Bd.*, 2012–Ohio– 5680, at ¶ 31 (stating that a "short sale" raises the inference of duress, and if the terms of the sale would likely be unacceptable to a typically motivated seller, the sale may not be an arm's-length transaction).

¶ 53 As the court stated in *Strongsville*, we do not hold "that any articulable motivation to sell is sufficient to support a finding of economic duress." 859 N.E.2d at 544. Rather, when, as here, there is evidence in the record that a seller was not typically motivated, but instead compelled to sell a property because of economic duress, we will not reverse the BAA's finding that a sale was not an arm's-length transaction.

### 3. Lack of Reasoning

¶ 54 To the extent CTS asserts that the BAA's order cannot stand because it does not specify why it credited the assessor's conclusion that the CVR sale was not an arm's-length transaction, we disagree that reversal is warranted. While the better practice is for the BAA to make findings and provide its reasoning for the ruling, its findings may be express or implied, and its decision need only be supported by the record. *Burns*, 820 P.2d at 1177.

¶ 55 The BAA, not a reviewing court, has the task of weighing the evidence and resolving any conflicts, and we will not substitute our judgment for that of the fact finder. *Colo. Arlberg Club*, 762 P.2d at 151. As relevant here, we may not set aside the BAA's decision unless it is unsupported by any competent evidence. *Id.* Accordingly, because there is competent and substantial evidence in the record to support the BAA's ruling that the CVR sale was not an arm's-length transaction, we conclude it did not err in refusing to consider it.

¶ 56 In light of this determination, we reject CTS's contention that the BAA refused to compile a representative body of comparable sales and, thus, erred as a matter of law.

## IV. Actual Value

¶ 57 Lastly, CTS asserts that there is no competent evidence in the record to support the BAA's valuation of the property. We disagree.

### A. Standard of Review and Applicable Law

¶ 58 A protesting taxpayer must prove to the BAA by a preponderance of the evidence that the assessor's valuation is incorrect. *Bd. of Assessment Appeals v. Sampson*, 105 P.3d 198, 204–05 (Colo.2005).

¶ 59 A reviewing court may not set aside a decision of the BAA unless there is no supporting competent evidence, *Burns*, 820 P.2d at 1177, or the decision reflects a failure to abide by the statutory scheme for calculating property tax assessments. *Sampson*, 105 P.3d at 208. Moreover, the determination of the degree of comparability of land sales and the weight to be given to the various physical characteristics of the property are questions of fact for the BAA to decide. *Golden Gate Dev. Co. v. Gilpin Cnty. Bd. of Equalization*, 856 P.2d 72, 73 (Colo.App.1993). If conflicting evidence is presented at the hearing, the credibility of the witnesses and the weight to be given to their testimony are committed to the fact-finding discretion of the BAA. *Burns*, 820 P.2d at 1177.

### B. Application

¶ 60 Here, we view CTS's arguments challenging the BAA's ruling as going to the weight to be given to the valuation evidence admitted at the hearing. We may not substitute our judgment on this issue for that of the BAA. *Steamboat Ski & Resort Corp.*, 23 P.3d at 1260.

¶ 61 Both the county assessor and CTS's property tax consultant testified at length regarding their respective appraisals of CTS's property. The assessor valued the property at $30,000 per acre; whereas, CTS's witness valued the property at $2,232 per acre. The assessor presented four comparable sales, and as required, she adjusted all prices per acre for time, location, and size. §§ 39–1–103(8)(a)(I), 39–1–104(10.2)(a), C.R.S.2012. These sales ranged in size from 40.22 to 148.2 acres; whereas, CTS's property was roughly 72 acres. Although these sales were outside the applicable base period, this was permissible because the assessor had determined that no comparable sales had occurred within that period. § 39–1–104 (10.2)(d), C.R.S.2012. Furthermore, as discussed above, the assessor explained in her appraisal and at the hearing why she did not consider the CVR sale an arm's-length transaction. And, we note that CTS does not contend that the assessor, in reaching her determination, failed to consider the additional factors applicable to determining the value of vacant land. § 39–1–103(14)(b). In short, the assessor's appraisal and valuation complied with the statutory requirements.

¶ 62 The assessor also testified that CTS's comparable sales were not nearly as similar to the property at issue as her comparable sales. Specifically, the assessor testified that CTS's proposed comparable sales, unlike CTS's property, were either farms or land acquired, at least in part, for oil and gas development. In addition, the assessor stated that the properties were located long distances from shopping areas and schools and some had poor access to roads.

¶ 63 Thus, because the BAA's decision is supported by competent evidence in the record, we will not disturb it on appeal. *ASARCO, Inc. v. Bd. of Cnty. Comm'rs*, 916 P.2d 550, 553 (Colo.App.1995) ("[P]rovided the assessor complied with the statutory scheme, we may not reverse the BAA's decision if it is supported by competent evidence, even if the record reveals that Taxpayer presented evidence contrary to the BAA's findings.").

¶ 64 This same analysis applies to CTS's contention that the BAA's conclusion was arbitrary and capricious. A reasonable person, considering all the evidence in the record, would not fairly and honestly be compelled to reach a different conclusion. *See Ramseyer v. Colo. Dep't of Social Servs.*, 895

P.2d 1188, 1192 (Colo.App.1995) (setting forth the "reasonable person" standard).

¶ 65 The order is affirmed.

JUDGE MILLER and JUDGE NAVARRO concur.